**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 93 CR 318** |
| | ) | |
| **JOHN T. HUNTER, JR.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

A jury convicted John T. Hunter, Jr. of, among other things, sixteen counts of bank robbery in violation of 18 U.S.C. § 2113(a) and sixteen counts of using a firearm in connection with the bank robberies in violation of 18 U.S.C. § 924(c)(1). A now-retired judge of this Court sentenced Hunter to 317 years in prison. Of this, 305 years were the result of sixteen mandatory consecutive sentences for each of the section 924(c) counts—the first for five years and the other fifteen for twenty years each. Hunter has now filed a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). For the reasons stated below, the Court grants Hunter's motion.

**Background**

**A.      Offense conduct**

The case involves very serious crimes: a series of armed bank robberies committed by Hunter Jr. (Hunter) and his father, John T. Hunter, Sr. (Hunter Sr.). Hunter participated in sixteen armed bank robberies over a period of ten months from May

1992 through March 1993.

According to the presentence report in Hunter's case, Hunter's father had, on his own, committed a series of bank robberies from March 1990 through February 1992. All of them followed a similar pattern: Hunter Sr. entered the bank alone wearing a "smiling old man" mask, brandished a weapon and took control, got money, and left the bank, fleeing in a previously-stolen automobile. These robberies stopped in February 1992, coinciding with Hunter Sr.'s hospitalization for a knee injury. Around the same time, the presentence report relates, Hunter (Jr.) lost his job and was separated from his wife. Hunter was twenty-six years old at the time.

The robbery spree involved in the present case started just after this, in May 1992. The robberies all involved Hunter and Hunter Sr., who by that point had apparently recuperated sufficiently to be out and about. All sixteen of the bank robberies were committed in a similar fashion, and they were all reported to be "similar [in modus operandi to] all the 'smiling old man' robberies previously carried out by Hunter, Sr." Presentence Report at 6. At some point prior to each robbery, the Hunters would steal two cars from locations near the target bank. Hunter would drive one car to the bank, often parking in front of the bank in a handicap spot, and Hunter Sr. would follow behind. Hunter would enter the bank alone, wearing a mask with the likeness of former presidential candidate Michael Dukakis. Hunter Sr. would remain outside in the second stolen vehicle. Upon entering the bank, Hunter would "[take] immediate control of the bank, announce[] the robbery, [tell] people what to do, often threaten[] to shoot people, [wear] gloves, and never [leave] any physical evidence behind." *Id.* Hunter consistently "carried a black semi-automatic pistol and a duffle bag" and "wore a blue

2

jean jacket or a three-quarter length cloth coat." *Id.* Upon exiting the bank, he would flee in the stolen car that he had driven there. Hunter Sr. would follow behind, assisting in Hunter's escape from the vicinity by "blocking or slowing traffic so that his son was not apprehended." *Id.* at 5. The Hunters would then meet at a predetermined location, ditch the stolen cars, and, presumably, flee from that location in their own car. Law enforcement estimated that the Hunters stole $285,000 in total across these sixteen bank robberies.

Up to this point, no one had been physically injured during any of the bank robberies. Unfortunately, that story changed in connection with Hunter's arrest, which took place in Tippecanoe County, Indiana on April 22, 1993, about one month after the last bank robbery. According to law enforcement, the Hunters were there to plan their next robbery. A local police officer responding to a late-night call regarding problems with electrical power in an apartment complex encountered a man—Hunter—who ran and then jumped into a small gray car driven by Hunter Sr. Hunter Sr. led police on a high-speed car chase, reaching speeds of 100 miles per hour. During this chase, Hunter obtained a scoped rifle from the backseat of the vehicle and shot multiple rounds at officers, striking one pursuing officer's car three times. Law enforcement lost sight of the Hunters' car, but Officer John Wells of the Lafayette County (Indiana) Police Department eventually located it at a farmhouse some distance away. When Officer Wells approached the car, Hunter shot at him from the car, striking Officer Wells's police vehicle and hitting him in the leg. Hunter then fled the scene in the gray car. Hunter Sr. also tried to flee, apparently in a different vehicle, but he crashed it into a police car and was taken into custody. Hunter Sr. was carrying a loaded handgun and currency, which

3

included a "bait bill" from one of the earlier robberies. Hunter Sr.'s car was searched and found to contain evidence connecting him to the robberies. The next day, April 23, 1993, Hunter called the FBI and surrendered himself to law enforcement near where Hunter Sr. had been arrested. The homes of both Hunters were searched and found to contain additional incriminating evidence relating to the robberies. Hunter and Hunter Sr. were charged with the robberies in federal court, and they were charged in state court in connection with the shooting of Officer Wells.[1]

Though, as the Court has noted, no one was physically injured during the sixteen bank robberies, that should not be read to imply that Hunter's actions caused no harm. Quite the contrary. A victim impact statement prepared by the prosecutor summarized statements by bank personnel and customers who were present during the robberies. The prosecutor noted "the psychological problems that have been experienced by those present at the robberies, and the fact that several individuals have sought psychiatric help to assist them in dealing with those events." *Id.* at 11. One teller—who had experienced two prior bank robberies—described this robbery as "the most violent and 'something I will never forget.'" *Id.* Another bank teller—who was two months pregnant at the time—stated that having a gun pointed "three feet away" from her was "indescribable." *Id.* And, most obviously, although no one was physically harmed at the banks, Officer Wells quite plainly was, and though his wound healed, at the time of the presentence report (March 1995), he "continue[d] to feel pain with weather changes or if

---

[1] The disposition of the state charges against Hunter relating to the shooting is unclear. Hunter Sr. was convicted, but according to Hunter's presentence report, the jury deadlocked as to Hunter, and a mistrial was declared. It is not apparent from the materials submitted to the Court whether Hunter was retried, if so whether he was convicted, and if so what the sentence was.

having to stand for long periods of time." *Id.*

## B.    Procedural history

On January 20, 1995, a jury found Hunter guilty of one count of conspiracy to commit bank robbery under 18 U.S.C. § 371, sixteen counts of bank robbery under 18 U.S.C. § 2113(a), and sixteen counts of using a firearm in connection with each of the charged bank robberies under 18 U.S.C. § 924(c)(1).  On April 18, 1995, the trial judge sentenced Hunter to a prison term totaling a little over 317 years.  Specifically, the judge imposed a five year prison sentence on the conspiracy count and 151 month sentences on each of the bank robbery counts,[2] all concurrent, for a total of 151 months (twelve and one-half years) on those counts.  This was followed by a five year sentence on the first of the section 924(c) counts, plus twenty years on each of the other fifteen section 924(c) counts, all consecutive to each other[3]—for a total of 305 years on the section 924(c) counts.  The total sentence, as indicated, was just over 317 years of imprisonment.

The Seventh Circuit affirmed Hunter's convictions and sentence on direct appeal. *See United States v. Hunter*, 86 F.3d 679, 683 (7th Cir. 1996).  Hunter then moved under 28 U.S.C. § 2255 to vacate his convictions and sentence, which the district court denied; the Seventh Circuit subsequently denied a certificate of appealability.  *United States v. Hunter*, 982 F. Supp. 541 (N.D. Ill. 1997); *United States v. Hunter*, No. 97-3888

---

[2] The sentence on the bank robbery counts was at the high end of the Sentencing Guidelines range (then considered mandatory) for those charges.

[3] At that time, section 924(c) required a twenty-year prison sentence for a defendant's second and each subsequent conviction under the statute, each term consecutive to the others.

(7th Cir. Aug. 20, 1998). In 2020, Hunter sought leave to file a new section 2255 motion; this too was denied. *United States v. Hunter*, No. 20-1339 (7th Cir. Mar. 26, 2020).

Hunter has been in custody continuously since April 23, 1993. At this point, he has been in prison for more than thirty-two years. Hunter was twenty-seven years old at the start of his robbery spree. He is now sixty years old.

### 1. Compassionate release motions

On April 7, 2019, Hunter made an initial request to Warden T.G. Werlich for consideration of a reduction in sentence pursuant to section 3582(c)(1)(A)(i). Warden Werlich denied this request on April 8, 2019, and Hunter received this denial on April 24. Hunter filed a request for reconsideration on April 28, 2019 and never received a response. Having exhausted administrative remedies, Hunter properly filed his motion for compassionate release before the previously assigned judge on August 9, 2019. *See* 18 U.S.C. § 3582(c)(1)(A) (permitting a defendant to file a motion for compassionate release after "the lapse of 30 days from the receipt of such request by the warden of the defendant's facility"). The case was briefly reassigned to a different judge before ultimately making its way to this Court in November 2019.

This motion has now been under advisement for an unusually long time, prompting the Court to offer a brief explanation. During the briefing and consideration of Hunter's initial motion, the Seventh Circuit issued controlling authority that appeared to bar granting Hunter's motion. *See United States v. Thacker*, 4 F.4th 569, 579 (7th Cir. 2021) (finding that section 924(c)'s amendment, "whether alone or in combination with other factors," is not an extraordinary or compelling reason for sentence reduction). The

6

Court, however, decided to keep the matter under advisement due to a circuit split that conceivably could have been resolved in Hunter's favor. And then the Sentencing Commission proposed Guideline amendments that changed the legal framework for adjudicating motions for compassionate release. The Court determined that waiting to see the outcome of the proposed Guideline amendments was the best course; once the amendments became effective on November 1, 2023, the Court ordered supplemental briefing to address the changes. Included in the supplemental briefing was a request from Hunter's counsel for oral argument on the motion. The Court heard arguments on the motion in January 2024. After that, it became apparent that issues regarding a relevant Guidelines amendment were likely to be reviewed by the Seventh Circuit in one or more other cases. The Court believed it best to defer ruling while awaiting a decision by the court of appeals. The Seventh Circuit has now addressed the particular point in question, so the Court proceeds to rule on Hunter's motion.

## Discussion

A federal prisoner may bring a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) after exhausting administrative remedies provided by the Bureau of Prisons. 18 U.S.C. § 3582(c)(1)(A). It is undisputed the Hunter has exhausted these administrative remedies.

When considering a motion for compassionate release, the Court engages in a two-step process. First, "the prisoner must identify an 'extraordinary and compelling' reason warranting a sentence reduction." *Thacker*, 4 F.4th at 576. Then, "[u]pon a finding that the prisoner has supplied such a reason," the Court "consider[s] any applicable sentencing factors in § 3553(a) as part of determining what sentencing

7

reduction to award the prisoner." *Id.*

"[T]he movant bears the burden of establishing extraordinary and compelling reasons that warrant a sentence reduction." *United States v. Newton*, 996 F.3d 485, 488 (7th Cir. 2021). A court should consider all the reasons raised by the movant "[i]ndividually and collectively" when determining whether a prisoner has sufficiently put forth extraordinary and compelling reasons. *United States v. Vaughn*, 62 F.4th 1071, 1073 (7th Cir. 2023). Though a particular reason on its own may be "insufficient to meet the threshold," the collective effect of all reasons raised by the movant may be extraordinary and compelling. *Id.*

## A.     Extraordinary and compelling reasons

Congress has empowered the Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction," though "[r]ehabilitation of the defendant alone" may not be an extraordinary and compelling reason. 28 U.S.C. § 994(t). On November 1, 2023, the Sentencing Commission's amendments to U.S.S.G. § 1B1.13 took effect. Three sections describing what constitutes extraordinary and compelling reasons are relevant to Hunter's motion:

> (3) Family Circumstances of the Defendant.— . . . (C) The incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent.

U.S.S.G. § 1B1.13(b)(3)(C).

> (6) Unusually Long Sentence.—If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized

circumstances.

*Id.* § 1B1.13(b)(6).

> (d) Rehabilitation of the Defendant.—Pursuant to 28 U.S.C. 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement. However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted.

*Id.* § 1B1.13(d).

### 1.    Unusually long sentence

In 2018, more than two decades after Hunter was sentenced, Congress amended section 924(c) to provide that the enhanced sentences under the statute apply only to offenses that occur "after a prior conviction under this section has become final." 18 U.S.C. § 924(c)(1)(C). This amendment significantly reduces the effect of "stacking" section 924(c) offenses and sentences in a single case. At the time of Hunter's conviction, section 924(c) provided for a five-year mandatory consecutive sentence for the first conviction under the statute and twenty-year mandatory consecutive sentences for the second and each subsequent conviction. Hunter was convicted of carrying and using a firearm, not brandishing (as the government incorrectly suggests); the separate and higher penalty for brandishing does not appear to have been adopted until in or about 1998, several years after Hunter was convicted.

The First Step Act, adopted in 2018, amended section 924(c) to provide that the higher twenty-year penalty for a second or subsequent conviction under the statute could be imposed only after a defendant's first conviction was final—in other words, only in a separate and later case. In Hunter's case, this would mean that if sentenced under

the version of section 924(c) in effect at the time of his convictions, but including the First Step Act overlay, he would have been subject to sixteen consecutive five-year sentences, for a total of eighty years, plus the 151-month sentence for the underlying bank robbery, for a total of a little over ninety-two years. But there too the law has changed. At the time of Hunter's case, a sentencing judge in this Circuit (even aside from the Guidelines sentence being mandatory) could not adjust the sentence for the underlying crimes—here the robberies—in light of the mandatory consecutive gun-related sentences under section 924(c). *See, e.g.*, *United States v. Roberson*, 474 F.3d 432, 437 (7th Cir. 2007). But the Supreme Court made clear in *Dean v. United States*, 581 U.S. 62 (2017), that this was wrong; a judge still must apply the mandatory-consecutive add-on but can impose a lower sentence for the underlying offenses in consideration of the mandatory consecutive sentence(s) under section 924(c). *Id.* at 71.

It is at least possible that, if sentenced today under this scheme, Hunter's total sentence would not have exceeded the mandatory eighty years. Eighty years, or ninety-two years, of course, is far more time than Hunter has served in prison at this point (the same is true of the 112-year sentence that the government seems to contend would be the minimum[4]). But the compassionate release statute does not preclude reducing a sentence to a lower level than a mandatory minimum in appropriate circumstances.

---

[4] As previously noted, the government contends that Hunter's sentence under section 924(c) would consist of fifteen consecutive terms of seven years because Hunter allegedly brandished his gun in each of the robberies. Gov't's Suppl. Resp. to Def.'s Mot. for Compassionate Release at 23 n.4. But as the Court explained above, this separate and higher penalty for brandishing was not adopted until several years after Hunter was sentenced.

10

To be more specific, the Court cannot reduce a sentence below an otherwise-applicable mandatory minimum because it is too long, and cannot do so retrospectively because the mandatory minimum has been eliminated or revised by Congress prospectively. But if an "extraordinary and compelling reason" exists for a sentence reduction *independent* of these or other prohibited grounds, nothing in section 3582(c) precludes a reduction below the otherwise applicable minimum.

As indicated earlier, the Court deferred ruling on Hunter's motion in part because of the Sentencing Guidelines amendment enabling a sentence reduction for defendants with very long sentences who, under changed law, would face a lower sentence today. The Seventh Circuit has now made clear, however, that a court may not consider section 924(c)'s nonretroactive amendment, or a disparity resulting from the nonretroactivity, as an extraordinary and compelling reason allowing a sentence reduction, irrespective of U.S.S.G. § 1B1.13(b)(6). *See United States v. Black*, --- F.4th ---, No. 24-1191, 2025 WL 758201, at *4–5 (7th Cir. Mar. 11, 2025). Because this Court is bound by the Seventh Circuit's decision in *Black*, it is foreclosed from considering Hunter's usually long sentence imposed via section 924(c) as an extraordinary and compelling reason under section 3582(c)(1)(A)(i).

### 2. Family circumstances

As indicated earlier, under U.S.S.G. § 1B1.13(b)(3)(C), "[t]he incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent" may constitute an extraordinary and compelling reason warranting a reduction of the defendant's sentence. Hunter argues that his elderly mother's need for a caregiver qualifies under this provision. Hunter's mother, Dorothy, is now ninety-two

years old.  She lives alone and has serious health issues.  A letter from Dorothy describes deteriorating health conditions and specifically notes "a heart condition, high blood pressure, and a sciatic nerve condition, all of which affect my mobility and ability to perform basic tasks to care for myself."  Def.'s Reply to Gov't's Suppl. Resp. to Notice of Suppl. Authority, Ex. A.

The government argues that Hunter's argument under section 1B1.13(b)(3)(C) falls short of the mark, for two reasons.  First, the government contends, Hunter has not shown that Dorothy's health problems prevent her from living independently, noting that his motion says that he plans to help Dorothy with "daily tasks [that] become more difficult with age."  Gov't's Suppl. Resp. to Def.'s Mot. for Compassionate Release at 6 (citation and quotation marks omitted).  Second, the government contends that Hunter is not the only available caregiver because Hunter has two other siblings who live near enough to visit Dorothy and because letters of support from Hunter's siblings promising to "provide [him] a stable and supportive environment" indicate their "ability to assist [their] mother as well."  *Id.*

The Court finds that Hunter has shown that his elderly mother's need for his care constitutes an extraordinary and compelling reason under section 1B1.13(b)(3)(C).  Regarding Dorothy's incapacity, she was present at the oral argument in January 2024, but only through and with the assistance of Hunter's counsel.  During that hearing, both when sitting and when moving from one place to another, Dorothy appeared to the Court to be frail and in very poor condition.  And she is, after all, ninety-two years old.  Given that over a year has passed since then, and that Dorothy is at a very advanced age, it is extremely unlikely that her condition is any better now.  Further, the specific

12

health conditions Dorothy describes in her letter to the Court, especially her sciatic nerve condition, indicate significant limitations regarding her mobility and, accordingly, her ability to accomplish the daily tasks necessary to ensure her well-being. The Court thus finds that she is incapacitated within the meaning of section 1B1.13(b)(3)(C).

The Court also finds that Hunter is the only *available* caretaker for Dorothy under the plain meaning of that phrase. The government's position seems to be that because Hunter's siblings *theoretically* could provide care for Dorothy, that means they are actually "available" to care for her. But practical limitations, noted in letters to the Court, undermine the government's position. Most explicitly, Hunter's two siblings who live near enough to serve as potential caregivers have indicated that they are not, in actuality, available to care for their mother due to their own work and familial obligations. One sibling, Maria, "has a demanding . . . job which requires travel" as well as her own two children to care for; Maria "can devote only 2 days *a month* to visit." Def.'s Reply to Gov't's Suppl. Resp. to Notice of Suppl. Authority, Ex. A (emphasis added). Another sibling, David, works two jobs while caring for his two daughters and thus "can only devote a couple hours per week to visit." *Id.*, Ex. A.

To be available as a caregiver within the meaning of section 1B1.13(b)(3)(C), one must be *actually* available. *See Available*, Merriam-Webster, https://www.merriam-webster.com/dictionary/available (last visited May 7, 2025) (defining "available" as "present or ready for *immediate* use"; "free and able to do something *at a particular time*"; or "qualified or willing to do something or to assume a responsibility" (emphases added)). Mere physical proximity does not make a person an "available" caregiver. Providing care, especially care required of someone of advanced age with serious

health issues and mobility limitations, requires being available when the person receiving care needs it, i.e., ready to provide immediate care, or able to render care at a particular time. A mere moment of reflection upon the realities of caregiving shows this to be true. The proposition that David's ability to visit a few hours a week, or Maria's ability to be there twice a month, makes them "available" to provide Dorothy with the sort of care she actually needs is unsustainable.

The Court finds that Hunter has established that he is the only *actually* available caregiver for his incapacitated parent and thus that he has established an extraordinary and compelling reason authorizing a reduction of his sentence.

### 3. Rehabilitation

Rehabilitation alone cannot serve as an extraordinary or compelling reason that permits sentence reduction. 28 U.S.C. § 994(t). The Court may, however, consider rehabilitation in combination with other extraordinary and compelling reasons. *United States v. Peoples*, 41 F.4th 837, 842 (7th Cir. 2022) (rehabilitation "cannot serve as a stand-alone reason for compassionate release," but "there is no indication that successful rehabilitation efforts may not be considered as one among other factors warranting a reduced sentence under § 3582(c)(1)(A)." (cleaned up)); *see also* U.S.S.G. § 1B1.13(d). *See generally Vaughn*, 62 F.4th at 1072–73.

Hunter contends that his clean disciplinary record and self-improvement while incarcerated should be considered along with other proffered reasons that show extraordinary and compelling reasons to reduce his sentence. Hunter notes that "[h]e has not had a disciplinary infraction in 12 years, and his record as a model inmate resulted in a transfer to a lower-security facility." Def.'s Suppl. Br. in Supp. of Mot. for

14

Compassionate Release at 9. Regarding self-improvement, Hunter says (and the government does not dispute) that he "has taken classes on computer skills, financial planning, psychology and Spanish language, among other subjects" and has obtained "a broad range of experiential training, including in tailoring, cooking, and plumbing installation." *Id.* at 12. Further, "[w]hile in Virginia, Hunter was employed for four-and-half [sic] years at Unicor textile factories." *Id.* In short, according to Hunter, "[d]uring his time in prison, [he] has transformed himself" and "is not the person he was 27 long years ago." *Id.* at 9, 12.

The government concedes that Hunter's "programming achievements and lack of disciplinary infractions is creditable" but argues that these circumstances "do[] not combine with any others to rise to the level of being extraordinary and compelling." Gov't's Suppl. Resp. to Def.'s Mot. for Compassionate Release at 7. To support its position, the government cites to a handful of district court cases in which the defendant's post-imprisonment rehabilitation did not constitute extraordinary and compelling reasons for release.

The government's argument is not persuasive. First, the cases cited by the government are notably distinct from the current case. In *United States v. Colon*, the court denied the defendant's request for compassionate relief utilizing different Sentencing Guideline factors and analyzing different factual circumstances. *United States v. Colon*, No. 97 CR 659-1, 2020 WL 7260804, at *2–4 (N.D. Ill. Dec. 10, 2020). In particular, the court in *Colon* was determining whether the defendant's rehabilitation in prison warranted a sentence reduction when considering the section 3553(a) factors, after giving the defendant "the benefit of the doubt that his medical condition present[ed]

an extraordinary and compelling reason for compassionate release." *Id.* at *4. Put differently, the court in *Colon* was not determining whether the defendant's rehabilitation, in combination with other reasons, constituted an extraordinary and compelling reason permitting a sentence reduction; rather the court gave the defendant the benefit of the doubt that he had shown an extraordinary and compelling reason and discussed the defendant's rehabilitation regarding the extent to which it warranted reducing his sentence. The court declined to order the release of the defendant "after serving 23 years of a life sentence" "given the severity of the conduct, the amount of the drugs distributed, [the defendant's] unquestionable leadership role, and the aggravating fact that [the defendant] orchestrated this criminal conduct from state custody." *Id.*

The government's other case, *United States v. Pennington*, is even further off base. In *Pennington*, the defendant's only proffered reasons for compassionate release were the risks posed to his health by COVID-19 and his rehabilitative efforts while incarcerated. *United States v. Pennington*, No. 2:13-CR-111, 2021 WL 1976803, at *1–2 (N.D. Ind. May 18, 2021). The court in *Pennington* found that the defendant's medical condition was not an extraordinary and compelling reason because, by the time of the court's ruling, he had been fully vaccinated against COVID-19. *Id.* at *1. Therefore, the only remaining consideration was the defendant's rehabilitative efforts, which, under the statute, is insufficient by itself to warrant a sentence reduction. *See id.* at *2.

Thus neither *Colon* nor *Pennington* presents analogous circumstances that persuade the Court that Hunter's rehabilitation—which is notably different from the rehabilitative efforts discussed in either case cited by the government—should not be considered in addition to other reasons when determining whether a sentence reduction

16

is warranted.

The Court finds that Hunter's rehabilitation while incarcerated, when considered together with his incapacitated mother's need for a caregiver, constitute extraordinary and compelling reasons authorizing a sentence reduction.[5]  In particular, Hunter's extensive efforts at self-rehabilitation, combined with his institutional record—the lack of disciplinary infractions and BOP's movement of him to a lower security facility—reflect that he is no longer the person who committed the armed robbery spree over three decades ago.  The Court will discuss this in more detail below when addressing the section 3553(a) factors.

**B.      Consideration of section 3553(a) factors**

Having found that Hunter has shown extraordinary and compelling reasons allowing a sentence reduction, the Court next "consider[s] any applicable sentencing factors in § 3553(a) as part of determining what sentencing reduction to award." *Thacker*, 4 F.4th at 576.  The relevant factors include Mr. Hunter's history and characteristics; the nature and circumstances of the crimes; due consideration of the seriousness of the crimes; promoting respect for the law; providing just punishment; affording adequate deterrence; protecting the public from further crimes by Mr. Hunter; providing Mr. Hunter with needed education, training, and treatment; the kinds of sentences available; the applicable Guidelines range; and the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct.  18 U.S.C. § 3553(a)(1)–(6).

---

[5] Even if this were not so, the needs of Hunter's mother would suffice on their own, as discussed earlier.

17

In assessing Hunter's history and characteristics, the Court focuses on who he is today, as that "provides the most up-to-date picture of [his] 'history and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011).

### 1. Hunter's history and characteristics; the nature of the crime

The seriousness of Hunter's crimes cannot be understated. Any bank robbery is a serious crime given the potential for emotional harm to the victims. The use of a firearm, as here, significantly increases the emotional harm and carries with it the possibility of physical harm. And Hunter did this not once, but sixteen times. It is a small miracle that no one was physically injured in the robberies. Finally, Hunter did deliberately harm one victim, Officer Wells—indeed, it is fair to say he did so with the intent to cause, at least, serious injury. These were extremely serious crimes.

On the other hand, though Mr. Hunter engaged in a series of very serious crimes, the resulting convictions were his first. He had no prior criminal record, and nothing in his background—aside from his relationship to Hunter Sr.—would have hinted at a propensity to criminal activity.

At this point, Hunter is sixty years old. Research published by the Sentencing Commission suggests that his risk of recidivism is small given his age. A person who (like Hunter) is in Criminal History Category I and is in his late fifties has a recidivism likelihood of 16.1%, the second lowest of any group included in the study; and given that Hunter has turned sixty, his recidivism likelihood falls to 11.3%—the lowest of any group. United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, at 25 fig. 22 (Dec. 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-

Age.pdf.  This research, coupled with Hunter's significant self-improvement and exemplary disciplinary record, suggests that, as he contends, he is not the same man he was when he committed these crimes and, correspondingly, that he does not pose the same danger to the public he once did.

Hunter's strong family support further affirms the proposition that he will avoid the influences that led to him committing these crimes in the first place.  As indicated by the presentence report, Hunter committed these crimes just after he had lost his job and had separated from his wife.  There is nothing to suggest that Hunter, now sixty and committed to spending his time caring for his elderly and ill mother, would resort to the same conduct to meet his financial needs.  Letters from his siblings show that he will be released in a supportive environment.  His sister Maria has stated that she will "assist him with finding employment" and "provide financial support."  Def.'s Suppl. Br. in Supp. of Mot. for Compassionate Release, Ex. 3.  Another sister, Debbie, attests that she will "help him achieve his goals including that of eventually becoming a certified HVAC technician" and "obtain[] employment."  *Id.*, Ex. 2.  As discussed above, Mr. Hunter has taken numerous classes and trained in other vocational skills.  His rehabilitative conduct while incarcerated indicates to the Court that Hunter is unlikely to reoffend.

### 2.    Providing education and training

Hunter has spent his time while incarcerated obtaining an education and vocational skills.  Though Hunter was already educated and licensed as a Certified Public Accountant at the time of his sentencing, his actions over the past thirty years indicate that he has used him time to continue improving himself.  As such, the Court finds that Hunter is primed to re-enter society and has the corresponding education,

skills, and familial support to do so.

### 3. Sentencing range & the kinds of sentences available

Though the Court may not consider section 924(c)'s amendment as an extraordinary and compelling reason warranting a sentence reduction, the Court may "consider the amendment in making its discretionary decision about how much relief, if any, to grant." *Black*, 2025 WL 758201, at *5.

As discussed above, Mr. Hunter's crimes are quite serious. A defendant convicted under section 924(c) may not be sentenced to probation, 18 U.S.C. § 924(c)(1)(D)(i), and the 305 years added to Hunter's sentence under section 924(c) was the lowest sentence that he could have received at the time. Today, if in this scenario the government were to charge him with sixteen separate 924(c) offenses—which is by no means certain—he would face eighty years of imprisonment for the section 924(c) convictions, plus whatever a sentencing judge found warranted on top of that for the bank robberies. Based on this, the government contends that "a reduction of more than two-thirds of the statutory mandatory sentence" would be inappropriate. Gov't's Suppl. Resp. to Def.'s Notice of Suppl. Authority at 25.

But that is not actually what Mr. Hunter requests. To date he has served thirty-two years in prison. Given federal good-conduct rules, that is the equivalent of a sentence of between thirty-eight and thirty-nine years. That would still represent a significant reduction from the current mandatory minimum of eighty years, but it's closer to one-half (or a little more), not two-thirds. The more important point is that the time Hunter has served in prison is still a *very* significant sentence, even for serious crimes involving threatened violence and emotional harm and, in connection with Hunter's

escape, actual physical harm.  The Court need go no further than its own relatively recent experience to justify this contention.

In *United States v. Luis Contreras*, Case No. 18 CR 719 (N.D. Ill.), the defendant was charged with committing violent crimes in aid of racketeering, including a murder and a separate attempted murder, in both of which he was the (or at least a) shooter. *See id.*, dkt. 231 (plea agreement) at 7–8.  To be sure, the defendant pled guilty, but what is more significant here is the sentence, and in particular the government's position on the sentence.  The defendant (unlike Mr. Hunter) had a significant criminal history, including multiple convictions for firearms possession and dealing, a kidnapping conviction, and a conviction for aggravated battery with a firearm, and he had served several prior terms of imprisonment.  *See id.* at 12–13.  His Guidelines advisory range was 360 months to life.  As part of the defendant's guilty plea, which included an admission to the murder and the attempted murder, the government *agreed to* a restricted sentencing range of thirty to thirty-five years in a binding plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C).[6]  *See id.* at 15.  The Court imposed a thirty-five-year sentence.  The defendant's release date, as reported on the Bureau of Prisons' website, is in October 2047, and he was originally taken into custody in October 2018, meaning that he is expected to serve twenty-nine years in prison for the murder and the attempted murder, which were encompassed in a charge of racketeering conspiracy.

Around the same time, in *United States v. Lozoya, et al.*, Case No. 19 CR 357

---

[6] Contreras did not get a sentence reduction under U.S.S.G. § 5K1.1; he had not cooperated with the authorities against others.

(N.D. Ill.), the government similarly agreed to a sentencing range of thirty to thirty-five years imprisonment for Santo Lozoya, a (non-cooperating) defendant who pled guilty to a gang-related murder and admitted he, along with a co-defendant, had shot at the victim after planning his murder.  *See id.*, dkt. 194 (plea agreement) at 7–9, 15.  The government also agreed that the Court could reduce the sentence below thirty years in consideration of the time Lozoya had already served in state custody—a little over two years—while awaiting trial on a state charge for the same murder (later dismissed).  *See id.* at 15.  The Court imposed a sentence of just over thirty years and four months, taking into account the two years and two months the defendant served in state court— for an effective total sentence of thirty-three years for the murder.  Lozoya's expected release date is in May 2046, and he was first taken into custody (by state authorities) in March 2017, meaning that he will serve a little under twenty-nine years for the murder.  Lozoya had two prior felony convictions, both resulting in incarceration.  *See id.* at 13.

The Court cites these cases not because they represent the full scope of violent crimes prosecuted in federal court, or even a representative sample, but rather to illustrate that the amount of prison time Hunter has already served is within the range of sentences served by defendants convicted of murder.  In this regard, the Court also notes that a study recently published by the Loyola University Center for Criminal Justice reflects that since Illinois implemented "truth in sentencing" (i.e. no good time reduction) for first degree murder cases, the average sentence for first degree murder in Illinois has been 35.5 years.  (Before "truth in sentencing," when persons convicted of first degree murder in Illinois would serve roughly one-half of the imposed sentence, the average sentence was 38.3 years, which means that the average time actually served

would have been a little over 19 years.)  *See* D. Olson et al., *Truth in Sentencing and Illinois Prisons*, Loyola Univ. Ctr. for Crim. Just. (Mar. 19, 2025), https://loyolaccj.org/blog/truth-and-sentencing-in-illinois-prisons.

In short, Hunter has already served as much time as most persons convicted of deliberate murders in Illinois.  Reasonable minds might differ over the relative severity of sixteen armed robberies with no physical injuries as compared with a single deliberate murder, but it is fair to say that a significant proportion of the population would find the murderer to have committed a more serious crime.

The Court concludes that the amount of time Mr. Hunter has served is sufficient to capture the seriousness of his offenses and to impose just punishment.

### 4.      Protecting the public from future crimes by Mr. Hunter

Section 1B1.13 requires a court to determine that "[t]he defendant is not a danger to the safety of any other person or to the community."  U.S.S.G. § 1B1.13(a)(2).  The Seventh Circuit has explained that section 1B1.13(a)(2) "matches the standard under § 3553(a)(2)(C)," the sentencing factor requiring courts to consider the need to protect the public from future crimes when imposing a sentence.  *United States v. Burnley*, 834 F. App'x 270, 272 (7th Cir. 2021).  As explained above, given Hunter's age and rehabilitation, he does not appear to pose a current danger to the community.  He appears to have rehabilitated himself while incarcerated, and if released it will be into a supportive environment.  More to the point, Mr. Hunter is sixty years old and will be required as a condition of supervised release to be a full-time caretaker for his sick mother.  He will be under supervised release, including this and other strict conditions, for three years.  This will permit careful monitoring of his actions and his compliance

with the law. And the Court will not hesitate to send Hunter back to prison if he strays from the requirements and restrictions that will be imposed upon him via supervised release. Under all the circumstances, the Court finds that Hunter is highly unlikely to engage in future crimes.

### 5. Respect for the law, just punishment, & deterrence

Finally, the government contends that reducing Hunter's sentence to time served would undermine respect for the law and the goal of avoiding unwarranted sentence disparities.

The Court disagrees and incorporates here its discussion under point 3 above. As explained above, Hunter's case was arguably an outlier in terms of the sentence he initially received (or at least would be so today), and he has since served over thirty-two years in prison. It would not detract from respect for the law to release him after serving that long in prison. This is so given the comparisons the Court noted earlier; the fact that if charged and sentenced nowadays Hunter would, in practical terms, face a far lower sentence (and, as a matter of prosecutorial charging priorities, might not even be charged with all sixteen of the section 924(c) counts); and that, as least from a demographic standpoint, he has likely "aged out" of and otherwise been deterred from further criminal activity. Service of thirty-two years in prison unquestionably sets a clear example to others that engaging in similarly egregious and violent conduct has very serious consequences.

There is also a viable argument that Hunter's original sentence was unjust. This was, to be sure, largely a function of how section 924(c) was then structured. And, as the Court has made clear, Hunter's crimes were extremely serious. But there was no

need to impose anything close to (in effect) five consecutive life terms—and a sentence *nine times as long* as an average Illinois sentence for murder—to justly punish Hunter and protect the community. The term to which the Court has now reduced Hunter's sentence, in the Court's view, is a far closer approximation of *just* punishment.

### Conclusion

For the reasons states above, the Court grants Hunter's motion for compassionate release [dkt. nos. 197, 201]. The Court reduces the defendant's prison sentence to time served. This is to be followed by a three-year term of supervised release, with conditions as set out in the amended judgment and commitment order to be entered by the Court (the Court has updated these from the original version based on intervening changes in the law). The conditions will include a requirement that Hunter live with and serve as the caregiver for his mother. The effective date of the reduction of the defendant's sentence to time served will be stayed for fourteen days, to May 27, 2025, to enable proper preparation for Mr. Hunter's release by the institution where he is incarcerated.

MATTHEW F. KENNELLY
United States District Judge

Date: May 12, 2025